# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILFRID GLOBAL OPPORTUNITY FUND LP, On Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc.,<br><br>Defendants. | Civil Action No. 15-CV-8774-VSB<br><br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff brings this federal securities class action pursuant for (i) violations of Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and (ii) fraud and negligent misrepresentation under New York common law, on behalf of all investors who purchased or otherwise acquired the common stock of SFX Entertainment, Inc. ("SFX" or the "Company"), between February 25, 2015 and August 17, 2015, inclusive (the "Class Period"). Plaintiff alleges the following upon personal knowledge and upon information and belief as to, among other things, the investigation conducted by Plaintiff and its counsel, including, without limitation, an analysis of Securities and Exchange Commission ("SEC") filings by SFX and other publicly available information relating to and/or disseminated by SFX and the other defendants (collectively, the "Defendants").

## NATURE OF THE ACTION

1.     Plaintiff Wilfrid Global Opportunity Fund LP ("Plaintiff") brings this action against SFX and certain members of its Board of Directors (the "Board") for (i) violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder and (ii) fraud and negligent misrepresentation under New York common law, for materially false and misleading statements Defendants made in connection with the purported acquisition of SFX by an entity owned and controlled by Robert F.X. Sillerman ("Sillerman"), SFX's Chief Executive Officer ("CEO") and principal shareholder (the "Transaction").

2.     On February 25, 2015, SFX publicly announced the Transaction, pursuant to which an entity owned and controlled by Sillerman would acquire all of the outstanding common stock of SFX not already owned (directly or indirectly) by Sillerman at a price of $4.75 per share (the "Initial Proposal") (or a valuation of $774 million). At the time of the Initial Proposal, Sillerman directly or indirectly owned 39.8% of SFX's outstanding common stock (the "Common Stock").

3.     Throughout the Class Period, Sillerman and SFX repeatedly affirmed and publicly proclaimed Sillerman's commitment and intention to consummate the Transaction and acquire SFX. Sillerman and SFX knowingly failed, however, to disclose that Sillerman did not have financing in place when he made the Initial Proposal and knew or recklessly disregarded that that Sillerman could not obtain the financing to consummate the Transaction. Sillerman and SFX knew or should have known that parties would rely on their public statements in connection with purchases and sales of Common Stock and that their failure to accurately and completely disclose the details regarding the Transaction could cause such parties harm.

4.     Indeed, SFX and Sillerman knew or should have known that Sillerman's true intent was not to "take SFX private," but, rather, to sell SFX (including Sillerman's 34.9 million

2

shares of Common Stock) to a third party. In fact, as SFX was aware, Sillerman had no financing in place relating to the Transaction and no real hope to obtain the more than $275 million necessary to consummate the Transaction. Sillerman and SFX publicly stated numerous times that Sillerman would vote his Common Stock (in the amount of approximately 40% of SFX's shares) in favor of any third party offer negligibly higher (2.5% of value) than his own.

5.     Because of SFX's growing debt and decreasing financial and operational performance, Sillerman never truly wanted or intended to acquire SFX. Instead, with the assistance of the other Defendants (including SFX), Sillerman orchestrated a "sham" process intended to entice third parties to purchase SFX, in an effort to sell Sillerman's (and certain of the other Defendants') Common Stock at a premium before the SFX's collapse could no longer be hidden from the public. The effect of the Initial Proposal and the false and misleading statements by Defendants during the Class Period was to fraudulently and intentionally inflate the share price of the Common Stock. Defendants ultimately were unable to attract a purchaser of SFX, but not before Plaintiff paid materially inflated prices for SFX Common Stock to its detriment.

6.     Defendants knew or recklessly disregarded that SFX's heavy spending and limited capital-raising options had rendered SFX's operations untenable and SFX was experiencing a catastrophic liquidity crisis. Defendants knew or recklessly disregarded that SFX was in an a precarious financial condition and that SFX could not support the $774 million valuation on which the Transaction was premised. Defendants' statements were intended to shield this impending liquidity crisis and inflate the price of the Common Stock in order to make SFX as attractive an acquisition candidate for a third party purchaser, enabling Defendants to sell their Common Stock at a premium to its actual value.

JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367 and Section 27 of the Exchange Act.

8.      Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78(aa) and 28 U.S.C. §1391(b) and (c), as the Company conducts business in this district, false statements were made in this district, harm to Plaintiff occurred in this district, and the acts and conduct giving rise to the violations set forth in this Complaint occurred in this district. SFX and Plaintiff each maintains its principal executive office in this district. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, in connection with the allegations set forth in this Complaint.

THE PARTIES

9.      Plaintiff is a limited partnership organized under the laws of the British Virgin Islands with its principal place of business located at 405 Lexington Avenue, Suite 3503, New York, NY 10174. Plaintiff purchased Common Stock during the Class Period as set forth in the attached certification.

10.     Defendant SFX is a corporation organized and existing under the laws of Delaware, with its principal executive office located at 902 Broadway, New York, New York 10010. SFX was incorporated on June 5, 2012, under the name "SFX Holding Corporation." On February 13, 2013, SFX changed its name to "SFX Entertainment, Inc." SFX's principal business activities consist of the acquisition and management of companies and assets relating to the production and promotion of live music festivals and events, production of music tours, selling event tickets through a ticketing platform, merchandising, and related services in

4

connection with the electronic dance music ("EDM") industry. The Common Stock is listed on NASDAQ under the symbol "SFXE". As of March 10, 2015 (the date on which Plaintiff first purchased Common Stock), SFX had 93,295,508 shares of Common Stock outstanding.[1] As of May 27, 2015 (the date on which Plaintiff last purchased Common Stock), SFX had 93,309,305 shares of Common Stock outstanding.[2] As of the date of this action, SFX had 97,651,046 million shares of Common Stock outstanding.[3]

11.     Sillerman has been active in and affiliated with numerous companies in the entertainment industry since, at least, the mid-1990s. Sillerman founded SFX in 2012 and has been the Chairman and CEO of SFX since its formation. Sillerman and entities owned and/or controlled by him hold approximately 40% of SFX's Common Stock. Sillerman is also the Executive Chairman and controlling shareholder of Viggle Inc. ("Viggle") and has been the executive director of Live Nation, Inc. ("Live Nation") since 1997. In the 1990s, Sillerman founded a company also called SFX Entertainment, Inc., ("Original SFX") which was sold to Clear Channel Communications, Inc. in 2000. From January 2008 through the date of this action, Sillerman has served as director (and, from January 2008 to January 2013, as Chairman and Chief Executive Officer) of Circle Entertainment, Inc. ("Circle"), a company developing location based entertainment venues. As of December 31, 2014, Sillerman owned 41% of Circle's common stock.  Sillerman also served as Chief Executive Officer and Chairman of CKX, Inc., a company that owns, develops, manages and commercially uses entertainment content, from February 2005 until May 2010. From August 2000 to February 2005, Sillerman was Chairman of FXM, Inc., a private investment firm. Sillerman is the founder of FXM Asset Management, LLC,

---

1 Based on SFX's Form 10-K for the fiscal year ended December 31, 2015 filed on March 16, 2015.

2 Based on SFX's Form 10-Q for the fiscal year ended March 31, 2015 filed on May 11, 2015

3 Based on SFX's Form 10-Q for the fiscal quarter ended June 30, 2015, filed on August 10, 2015.

which is itself the managing member of MJX Asset Management, a company principally engaged in the management of collateralized loan obligation funds, and served as its managing member from November 2003 through April 2010.

12.     Sillerman and defendant D. Geoffrey Armstrong ("Armstrong") together founded SFX Broadcasting, Inc. ("SFX Broadcasting"), which went public in 1993 and was later sold to AMFM, Inc. Armstrong has served on the Board of SFX since December 2012.  Armstrong and Sillerman founded SFX Broadcasting and Armstrong subsequently served as Chief Financial Officer, Chief Operating Officer and a director. Armstrong has also been a director of Live Nation since 1997. Armstrong is chairperson of the Audit Committee of SFX. Armstrong is currently Chief Executive Officer of 310 Partners, a private investment firm.

13.     John Miller ("Miller") has served on the Board of SFX since October 2012. Miller was also appointed as a non-executive board member of Viggle in 2012 and is currently chairman of Viggle's Compensation Committee.  Miller was also a director of Circle from January 2009 to August 2012 and, from February 2005 through January 2009, served as a director of CKX.

14.     Michael John Meyer ("Meyer") has served on SFX's Board since May 2013 and also currently serves as a director of Circle and of Viggle.

15.     Defendants SFX, Sillerman, Armstrong, Miller, and Meyer are collectively referred to herein as the "Defendants".

## CLASS ACTION ALLEGATION

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired SFX common stock during the period between February 25, 2015 and August

17, 2015, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SFX's common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are tens of thousands of members in the proposed Class who are geographically dispersed throughout the United States. Members of the Class may be identified from records maintained by SFX or its transfer agent and may be notified of the pendency of this action by mail, using the form(s) of notice customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class, because all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the numerous questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about SFX and Sillerman's ability to consummated his offer to buy the Company;

(c) whether Defendants acted with scienter;

(d) whether reliance upon Defendants' alleged false and misleading statements can be presumed pursuant to the fraud-on-the-market doctrine;

(e) whether and to what extent the market price of SFX's stock was artificially inflated during the Class Period as a result of Defendants' violations of the securities laws; and

(f) to what extent the members of the Class have sustained damages resulting from Defendants' violations of the federal securities laws and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for many members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### I.  BACKGROUND

22.     On December 1, 1997, Sillerman formed Original SFX, a company whose principal business was the acquisition and consolidation of regional concert promoters into a single unified entity. In 2000, Sillerman sold Original SFX to radio broadcasting company Clear Channel Communications for $4.4 billion. In June 2012, Sillerman founded SFX.

23.     On October 10, 2013, SFX commenced its initial public offering of 20 million shares of Common Stock at a price of $13.00 per share. The IPO prospectus and related registration documents touted the Company as "the largest producer of live events and entertainment content focused exclusively on the electronic music culture, based on attendance and revenue."

24.     Prior to the IPO, SFX purchased Beatport, LLC ("Beatport") for $58 million. Upon information and belief, Beatport is the principal source of music for EDM disc jockeys. Beatport offers over 3.5 million music tracks, from over 31,000 music labels, and its free music previews generate approximately four million streams daily. Beatport also provides access to music and industry news, music reviews, podcasts, videos, DJ profiles, event listings and venue details.

25.     Beginning in November 2013, SFX grew through various acquisitions. SFX used most of the $260 million it raised in its IPO to purchase companies that owned and operated EDM festivals around the globe. On November 4, 2013, SFX acquired Made Event, a premier electronic music production company and the creator of the Electric Zoo Festival. On November 13, 2013, SFX purchased Arc90, Inc., a mobile and web applications designer. On November 19, 2013, SFX acquired i-Motion GMBH, a leading German electronic music promoter.   On November 21, 2013, SFX acquired a 50% interest in Rock in Rio, one of the world's largest festival franchises. On December 3, 2013, SFX acquired 75% of Paylogic, a primary new generation ticketing company in Europe for a price of approximately $22 million.

26.     On February 12, 2014, for a purchase price of $62.3 million, SFX acquired a 50% interest in a holding company that owns 80% of the equity shares of Rock World S.A., a Brazilian company engaged in the organization of music festivals held under the "Rock in Rio" name. On February 28, 2014, SFX acquired the remaining 50% of the equity of B2S Holding BV it did not already own for $14.3 million. B2S is one of the world's leading EDM event organizers, including the Decibel, Hard Bass, Thrillogy, Knock Out, and Loudness festivals. On March 14, 2014, SFX acquired Flavorus, Inc. ("Flavorus") for $18 million in cash. Flavorus is a

ticketing company with a software platform which allows for high-volume sales and customizability relating to various types of events.

## II.    THE INITIAL PROPOSAL

27.    On February 25, 2015, SFX announced Sillerman's Initial Proposal, pursuant to which Sillerman would acquire all of the outstanding shares of Common Stock that he did not already own at a price of $4.75 per share. The proposed purchase price was at a significant premium over the market price for the Common Stock immediately prior to the announcement (of $3.70 per share of Common Stock).[4]

28.    In connection with his Initial Proposal, Sillerman was quoted as stating:

> I have put forward a proposal that offers substantial value and flexibility to all shareholders. Given the inherent risks in our business, my offer guarantees a substantial premium to current price. Those shareholders who are interested in remaining as investors in the company alongside me will have the ability to elect to keep all or part of their shares.

29.    From the outset, it was clear what Sillerman's true intent in making the Initial Proposal was. While assuring the market that he would guarantee shareholders a substantial premium over the market price, Sillerman also specifically stated that he would assist SFX in exploring alternative transactions and that he would support an alternative sale.

30.    Sillerman, as SFX's CEO and largest shareholder, with material and non-public information regarding the Company's financial condition and its future prospects, "guaranteed" shareholders that he would consummate the transaction at a price that was a "substantial premium" to the then current price of SFX stock. Sillerman's statements were materially false and misleading because, among other things, at that time he did not have access to financing

---

4 Represents the closing price for the Common Stock on February 24, 2015.

sufficient to consummate the Transaction and he knew or was reckless in not knowing that he had no hope of obtaining such financing.

31.     Sillerman's statements were also materially false and misleading because Sillerman knew or recklessly disregarded and failed to disclose that SFX's period of asset acquisitions was ending, that SFX was not going to meet its publicly filed projections, and that SFX's then-present financial condition and future prospects were deteriorating rapidly.

32.     Sillerman's statements were not accurate statements of his intent. Rather, Sillerman intended to convince investors and potential acquirers that his Initial Proposal was credible, in order to establish a "floor" on SFX's market value (which was significantly higher than the actual value of SFX), thereby permitting Sillerman to sell his shares of Common Stock at a premium before the truth about the deterioration of the Company could no longer be concealed. Indeed, Sillerman never had the financial capacity to buy SFX. In addition, the provision to allow shareholders to remain as investors in the new company gave the false impression that SFX's shareholders would continue to own a security that was worth at least $4.75 and that Sillerman would be able to finance the transaction.

33.     In response to Sillerman's Initial Proposal, the market price for the Common Stock price rose from $3.70 to $4.79 per share.

34.     On March 10, 2015, SFX announced that the Company had formed a special committee of the Board (the "Special Committee"), consisting of Defendants Miller, Meyer, and Armstrong, for the purpose of evaluating the Initial Proposal and considering alternatives to the proposed transaction (including alternative acquisition offers).

35.     On March 13, 2015, SFX issued a press release announcing its fourth quarter and full-year 2014 financial results. As of year-end 2014, SFX reported that its losses increased to

11

$131 million (or $1.49 per share). The year-end losses were much larger than previously projected. In addition, SFX reported that its revenues for 2014 was $386.2 million (as compared to $356.7 million in 2013), its pro forma adjusted EBITDA for 2014 was a loss of $3.4 million (as compared with 2013 pro forma adjusted EBITDA of $17.7 million), and pro forma attendance for all SFX's events and festivals increased 8.9% (with 88 festivals in 2014 compared to 71 in 2013). For the year ended December 31, 2014, SFX's direct costs totaled $218.4 million (compared with $113.5 million for 2013).

36.     For the fourth quarter of 2014, SFX reported a loss of $41.1 million (or $0.46 per share), SFX's pro forma revenues fell 7.7% to $95.9 million in 2014 (compared to $103.9 million in fourth quarter of 2013), adjusted EBITDA fell to negative $7.7 million in 2014 (compared to positive $500,000 in fourth quarter 2013), pro forma same festival attendance (for festivals held in both the 2013 and 2014 fourth quarters), fell 18.5%,[5] and pro forma festival attendance declined 8.7% year over year to approximately 560,000. In short, the cost of putting on more festivals was increasing but the attendance was decreasing.

37.     On March 13, 2015, for the first time ever, SFX also provided full year guidance on its projected fiscal year financial results. Notwithstanding SFX's reported weak performance, SFX publicly stated that:

> "full year 2015 revenues are expected to be in excess of $500.0 million with adjusted EBITDA of $60.0 million to $70.0 million inclusive of the anticipated impact of foreign exchange as a significant portion of the Company's operations occur internationally."

38.     SFX's report was false and misleading because Defendants knew or recklessly disregarded and failed to disclose that there was no reasonable basis, given the recent past results

---

5 SFX held 24 festivals in the fourth quarter of 2014 versus 16 for fourth quarter 2013.

and current performance of SFX's business, to project such high revenues and EBITDA for 2015. In fact, Defendants knew or recklessly disregarded and failed to disclose that SFX's debt was increasing, margins were decreasing, SFX was losing money at an alarming rate, and SFX's borrowing options were severely constrained. By providing false "guidance" for the first time ever, Defendants misled the market with the intent (and actual result) of increasing and maintaining the market price of the Common Stock and fraudulently inflated rates to make SFX appear more attractive to potential third party buyers.

39.     When Sillerman made his Initial Proposal on February 25, 2015, Sillerman knew or recklessly disregarded and failed to disclose that the fourth quarter and 2014 year-end results were almost certain to miss analysts' expectations by a materially negative amount. Upon information and belief, Sillerman intentionally timed the announcement of his Initial Proposal to increase the price of the Common Stock and mitigate adverse market reaction to the upcoming announcement of 2014 annual and fourth quarter financial results.

40.     On May 11, 2015, SFX reported its financial results for the three months ended March 31, 2015. SFX reported a net loss and diluted loss per share of $41.6 million and $(0.46 per share, respectively (compared with losses of $56 million and $0.65 per share in the first quarter 2013). SFX further reported that direct costs for the three months ended March 31, 2015 totaled $34.2 million and that SFX had cash and cash equivalents totaling $45.8 million.  SFX's pro forma adjusted EBITDA was negative $10.6 million (compared to the prior quarter's negative $7.7 million). Defendants attempted to explain SFX's poor first quarter performance by stating that:

> "the first quarter is the Company's seasonally slowest quarter for live events and revenue, and during the period SFX held five owned festivals that were also held in the first quarter of 2014. On

a same festival basis, attendance for these festivals grew l.2% and revenue grew l.2% . . . ."

41.      SFX continued to provide 2015 "guidance" in its first quarter press release, projecting revenues of $500 million and pro forma adjusted EBITDA in the range of $55.0 to $65.0 million. SFX blamed the decrease from its March 2015 reports on reductions due to "foreign exchange losses" and losses related to startup costs of the Rock in Rio Las Vegas event. This guidance was false and misleading and Defendants knew or were reckless in not knowing that that there continued to be no reasonable basis, given the recent past results and poor operating performance of the SFX's business, to project such high revenues and EBITDA.

42.      At this time, however, Defendants were fully aware that SFX was already experiencing a liquidity crisis. As of March 31, 2015, SFX had drawn $6 million under its $30 million revolving credit line (the "Revolver") with Barclays Bank PLC ("Barclays"). As of May 8, 2015, however, and less than 2 months later, SFX had drawn an aggregate amount of $18.3 million under the Revolver and had only $11.7 million of availability remaining.

43.      In a footnote to the SFX's First Quarter10-Q, filed March 16, 2015, SFX disclosed that Barclays and SFX had entered into an amendment to the February 7, 2014 Revolver credit agreement (the "Credit Agreement"). Among other things, the amendment prohibited SFX from borrowing money or requesting letters of credit under the Credit Agreement unless an amount equal to 105% of the amount of the loan or letter of credit, as applicable, was paid into a deposit account of Sillerman Investment Company III LLC ("SIC"), an entity owned and/or controlled by Sillerman. All amounts held in such deposit account are subject to a first priority lien in favor of the administrative agent under the Credit Agreement.

### III.   ENTRY INTO THE MERGER AGREEMENT

44.    On May 26, 2015, the Company announced that SFX had signed that certain merger agreement (the "Merger Agreement") by and among SFX, SFXE Acquisition LLC ("SFXE Acquisition"),[6] and SFXE Merger Sub Inc. ("Merger Sub"), a wholly owned subsidiary of SFXE Acquisition. Under the Merger Agreement, Sillerman would acquire through his owned and controlled entities, all of the outstanding Common Stock that Sillerman did not already own at a price of $5.25 per share (the "Cash Merger Consideration"). The Merger Agreement was premised on a $774 million valuation of SFX. The Merger Agreement further provided that any shareholder who is a holder of record of Common Stock could elect to receive, in lieu of the Cash Merger Consideration, one share of non-voting Class B common stock, par value $0.0001 per share, of the surviving corporation (the "Stock Merger Consideration"). The Merger Agreement further provided that, from the date of the Merger Agreement until July 10, 2015 (the "Go-Shop Period") the Company could "initiate, solicit and encourage any alternative acquisition proposals from third parties, provide nonpublic information to such third parties and participate in discussions and negotiations with such third parties regarding alternative acquisition proposals."

45.    As of May 26, 2015, Sillerman beneficially owned, directly or indirectly, 37.4% of the Common Stock. Sillerman reiterated his earlier pronouncement that he was willing to vote his shares in favor of any third party offer negligibly higher - - 2.5% - - than his proposal. In other words, Sillerman again evidenced his true intent - - to cause third parties to make acquisition offers for SFX that exceeded his own (thereby allowing Sillerman to sell his Common Stock at a premium to SFX's actual value).

---

6 SFXE Acquisition is an affiliate of SIC.

46.     The Merger Agreement further provided that Sillerman was required to provide the Special Committee with fully executed debt and/or equity commitment letters or similar agreements describing the terms and conditions for the financing of 100% of the Cash Merger Consideration within ten (10) days after receiving a written request from the Special Committee. The Merger Agreement stated that this written request would not be delivered until the Go-Shop Period had expired. In other words, Sillerman was not required to provide evidence of the financing necessary to consummate the Transaction until *after* other entities made an offer for SFX. Defendants knew or should have known that such a provision was non-market.

47.     In connection with the entry into the Merger Agreement, Sillerman further stated that:

> "I hope to use all-equity financing to fund the proposed going-private transaction. I have no plans to have the Company incur additional debt to fund the transaction."

48.     The members of the Special Committee knew that entering into the Merger Agreement, particularly because the cash consideration portion of the purchase price was increased from the Initial Proposal from $4.75 to $5.25 per share, would have a material positive impact on the price of the Common Stock. In fact, the reaction was very positive and the market price of Common Stock rose from $4.12 to $4.94 per share. Defendants, however, knew or recklessly disregarded that SFX was in a precarious financial condition and Sillerman did not have, and could not reasonably be expected obtain, the financing necessary to (i) support a $774 million SFX valuation and (ii) enable Sillerman to acquire the Common Stock at a price of $5.25 per share.

49.     By entering into the Merger Agreement (and making multiple public announcements in connection therewith), Defendants misrepresented to the investing public

16

(including Plaintiff) that SFX was worth, at minimum, $5.25 per share, and repeatedly affirmed that the Transaction was both credible and feasible. Moreover, the Merger Agreement provided that the Special Committee unanimously determined that the transaction was fair to SFX's stockholders and unanimously recommended that the Board approve the Merger Agreement. By recommending that the Board approve the Merger Agreement (and making public announcements in connection therewith), Defendants misrepresented to the investing public (including Plaintiff) that SFX was worth, at minimum, $5.25 per share and affirmed that the Transaction was both credible and feasible. The Special Committee's recommendation was false and misleading because the members of the Special Committee knew or recklessly disregarded that Sillerman did not have and could not obtain financing necessary to (i) support a $774 SFX valuation and (ii) enable Sillerman to acquire the Common Stock at $5.25 per share.

## III.   SFX ISSUES SHARES TO HEDGE FUNDS AND SILLERMAN

50.    Defendants knew that SFX desperately needed cash to support its business.  The cost of operating SFX's business was increasing steadily. Defendants knew that SFX was unable to issue new debt without breaching existing covenants to SFX's lenders. In addition, Barclays had demanded that SFX raise collateral in order to be able to borrow from the Revolver.

51.    On June 18, 2015, SFX agreed to sell 2,305,000 shares to certain funds at an aggregate price of $10 million (or $4.34 per share). SFX also sold 1.04 million shares to SIC, at an aggregate price of $5 million (or $4.82 per share). Sillerman also granted a "put right" to the investing funds requiring Sillerman to purchase 2,305,210 shares from such funds for $5.25 per share upon the occurrence of certain conditions, including, among other things, if the Transaction was not consummated. This financing transaction provided SFX with critically necessary cash, however, it also had the effect of making Sillerman's $5.25 offer much more attractive to holders

of the Common Stock. The transaction also lent credibility to Sillerman's purported ability to finance the transaction and assured the investing public (including Plaintiff) that Sillerman was capable of obtaining financing to consummate the Transaction.

52.     Notwithstanding the foregoing and the repeated announcements to the contrary, Sillerman knew that he did not have and would not be able to obtain the financial partners necessary to close the Transaction. Moreover, Sillerman never had the financial capacity or intent to acquire SFX. Nevertheless, Sillerman continued to falsely assure the investing public (including Plaintiff) that he was committed to acquiring (and was able to acquire) SFX.

53.     On July 19, 2015, Sillerman stated:

> "The recent stock transactions demonstrate an increased commitment on my part to consummate this transaction. My advisors and I are continuing to advance this going-private transaction under the same terms as those spelled out in a definitive agreement executed on May 26, 2015."

54.     Sillerman's statement affirming his commitment to consummate the Transaction was materially false and misleading because he knew or recklessly disregarded and failed to disclose that he did not have and could not reasonably be expected to obtain the financing to consummate the Transaction. Upon information and belief, Sillerman's false statements were intended to continue the deception commenced with his Original Proposal to hide SFX's liquidity crisis and inflate SFX's stock price during the Go-Shop Period in order to make SFX an attractive acquisition candidate for a third party purchaser at a price greater than $5.25.

IV.   **AMENDMENT OF THE MERGER AGREEMENT**

55.     Upon information and belief, between the signing of the Merger Agreement and July 10, 2015, SFX did not receive any interest from third party acquirers. In an effort to generate interest and continue Defendants' sham process, SFX announced on July 10, 2015 that

the Merger Agreement had been amended (the "Amendment") to extend the Go-Shop Period to July 24, 2015 to "permit" the solicitation of acquisition proposals from alternative purchasers.

56.     The Amendment also extended the time for delivery of Sillerman's financing commitments from ten (10) days to fifteen (15) days after receiving a written request from the Special Committee. The Amendment further provided that, if during the extension of the Go-Shop Period, SFX terminated the Merger Agreement in favor of a "superior proposal," Sillerman and his controlled affiliates would vote in favor of such alternative transaction.

57.     Defendants hid the true reason for their extension of the Go-Shop Period and the deadline for Sillerman to deliver financing commitments. By amending the Merger Agreement (and making public announcements in connection therewith), Defendants once again misrepresented to the investing public that SFX was worth, at minimum, $5.25 per share and affirmed that the transaction was credible and feasible.   Defendants knew or recklessly disregarded and failed to disclose that Sillerman could not reasonably be expected to obtain the financing necessary to consummate the Transaction and that the extension of the Go-Shop Period was an "eleventh hour" attempt to entice a third party to purchase SFX at a premium to SFX's actual value.

58.     On July 30, 2015, SFX announced that the Special Committee had provided notice to Sillerman requiring that Sillerman deliver fully executed commitment letters for the financing of 100% of the Cash Merger Consideration by August 13, 2015.

V.     **SFX ANNOUNCES FINANCIAL RESULTS**

59.     On August 10, 2015, SFX reported financial results for its second fiscal quarter and six (6) months ended June 30, 2015, in which SFX reported a net loss and loss per share of $48 million and $0.52, respectively. Direct costs for the three (3) months ended June 30, 2015

totaled $99.1 million and direct costs for the six (6) months ended June 30, 2015 totaled $133.2 million. SFX's net loss in the second quarter grew 36.2% to negative $48.0 million.

60.     The second quarter financial results further evidence SFX's continued cash burn. After raising $260 million in the IPO and then issuing nearly $300 million in debt the years since, SFX was inexplicably almost out of cash. Indeed, SFX's reported cash and cash equivalents at the end of SFX's second quarter consisted of $38.6 million, although it excluded at least $13.6 million of cash proceeds held on behalf of third party ticketing clients. That figure, however, greatly overstated SFX's true cash availability at that time. Upon information and belief, SFX had only $5.8 million available under its Revolver (which was originally $30 million) after SFX drew down $24.2 million at the end of the quarter.

## VI.    SILLERMAN FAILS TO DELIVER COMMITMENT LETTERS

61.     Sillerman failed to provide the Special Committee with financial commitment letters on or before August 14, 2015. On August 14, 2015, SFX announced that the Special Committee (with the concurrence of Sillerman) "has authorized the continued exploration of strategic alternatives for the Company, including the sale of all or substantially all of the Company's assets in whole or in part." SFX further added that it would "entertain" offers for the SFX, as well as assets not "central" to SFX's core business, through at least October 2, 2015. More specifically, SFX stated that the offer period was extended to October 2, 2015 to "allow potential bidders and their financing sources to have visibility into the Company's performance during its peak festival season."

62.     Defendants' extension of the offer period and the explanation for doing it were materially misleading. Defendants knew or recklessly disregarded that SFX's ticket sales were declining and that it had substantial cash requirements that, if not met, would force the

cancellation of material amount of SFX's events or festivals. In fact, on September 1, 2015, SFX cancelled its One Tribe festival scheduled for September 25th and 26 "due to poor ticket sales." Moreover, in an clear attempt to conserve cash and therefore appear more profitable, SFX withheld music royalty payments to artists from its Beatport platform, reporting that royalty payments for April, May and June were "trapped" until it completed the Transaction.

63.    SFX's August 14 press release further represented that Sillerman:

> "continues to be interested in taking the Company private, either alone or with one or more strategic partners, although also at a lower price given the Company's share price has declined substantially below that in the merger agreement."

64.    On August 14, 2015, the price of SFX stock fell from $1.94 to $1.39 per share. On August 17, 2015, Sillerman once again reiterated his intent to provide a revised offer for the Common Stock. Upon information and belief, however, Sillerman knew or should have known that he would never provide an additional offer due to SFX's deteriorating financial and operational performance, because he knew or recklessly disregarded that he could not get the financing necessary to consummate the Transaction.

65.    On August 18, 2015, SFX terminated the Merger Agreement. Under the Merger Agreement, Sillerman is obligated to pay the Company a termination fee of $7.8 million as a result of such termination. SFX agreed to extend the due date for the payment of the termination fee until October 2, 2015. On August 18, the Common Stock closed at a price of $1.15 per share.

66.    On August 26, 2015, Moody's Investors Service downgraded SFX debt. Moody's reported that the company has "no tangible sign" of producing positive cash flow and has limited remaining cash and, therefore, Moody's was lowering SFX corporate and second-lien note ratings from Ca1 to Caa3.

PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

67.     Throughout the Class Period, Plaintiff and the other members of the Class justifiably expected Defendants to disclose material information in connection with the offering and sale of the Common Stock.   Plaintiff and the members of the Class would not have purchased the Common Stock at artificially inflated prices if Defendants had disclosed all material information. Thus, reliance by Plaintiff and the Class members should be presumed with respect to Defendants' false and misleading statements and the failure to disclose material information necessary to make the statement made not misleading.

68.     Throughout the Class Period, the Common Stock traded in an "efficient" market that promptly digested current information with respect to SFX from all publicly available sources and reflected such information in the prices of the Common Stock.

69.     The following facts demonstrate that the market for the Common Stock was efficient at all relevant times: (i) the Common Stock met the requirements for listing, and was listed and actively traded on the NASDAQ (a highly efficient automated market); (ii) SFX filed periodic public reports with the SEC; (iii) SFX regularly communicated with public investors via established market communication mechanisms, including, without limitation, through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (iv) SFX was followed by a number of securities analysts who wrote reports distributed to the sales force and customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

70.     As a result of the foregoing, the market for the Common Stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the stock price. Plaintiff and the other members of the Class relied on the

integrity of the market price for the Common Stock and is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

71.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omitted to state material facts necessary to make the statements made not misleading. Defendants also engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Common Stock and operated as a fraud or deceit on Class Period purchasers of the Common Stock (including Plaintiff) by materially misrepresenting Sillerman's intent to purchase all of the Common Stock when they knew that he did not have and nor could he reasonably be expected to obtain the financing necessary to consummate the Transaction. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Common Stock fell significantly.   As a result of its purchases of Common Stock during the Class Period, Plaintiff and the Class suffered significant economic loss (*i.e.*, damages) under the federal securities laws.

72.     Defendants' false and misleading statements had the intended effect and caused the Common Stock to trade at artificially inflated levels throughout the Class Period.

## NO SAFE HARBOR

73.     SFX's "Safe Harbor" warnings accompanying its reportedly forward-looking statements during the Class Period were ineffective to shield those statements from liability. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made and/or were in actuality statements of then-present fact.

74.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

75.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

## COUNT I
Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission
(Against All Defendants)

76.     Plaintiff repeats and realleges all of the preceding allegations of this Complaint as though set forth fully herein.

77.     This Count is asserted against all Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.     As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading and engaged in acts and practices, and in a course of conduct, which operated as a fraud and deceit upon the purchasers of the Common Stock in an effort to maintain artificially high market prices for the Common Stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

79.     Defendants' false and misleading statements and omissions were intended to, and in fact did, as alleged herein: (i) deceive the investing public, including Plaintiff and the other

members of the Class; (ii) artificially inflate and maintain the market for and market price of the Common Stock; and (iii) cause Plaintiff and the other members of the Class to purchase the Common Stock at inflated prices that were significantly higher than SFX's actual value.

80.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     Defendants had actual knowledge of the misrepresentations and omission of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth from the investing public and to support the artificially inflated prices of the Common Stock.  Defendants made the materially false and misleading statements knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud, upon Plaintiff and other members of the Class. Defendants' materially false and misleading statements were made in connection with the purchase or sale of the Common Stock.

82.     In ignorance of the false and misleading nature of Defendants' materially false and misleading statements, and relying directly or indirectly on those statements and/or upon the integrity of the market price for the Common Stock, Plaintiff and the other members of the Class purchased Common Stock at artificially inflated prices during the Class Period.

83.     Plaintiff and the Class have suffered damages. In reliance on the integrity of the market and Defendants' statements, Plaintiff and the other members of the Class paid artificially inflated prices for Common Stock. Plaintiff and the Class would not have purchased Common

Stock at the prices it paid, or at all, had they been aware that the market prices for Common Stock had been artificially inflated by Defendants' fraudulent course of conduct.

84.     The market price for the Common Stock declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by Defendants, as described above.

85.     Plaintiff and the other members of the Class were materially damaged as a direct and proximate result of its purchases of Common Stock at artificially inflated prices and the subsequent decline in the price of such Common Stock when the truth was finally disclosed.

86.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and are liable to Plaintiff and the Class for damages suffered in connection with their transactions in the Common Stock.

COUNT II
For Violation of Section 20(a) of the Exchange Act
(Against the Individual Defendants)

87.     Plaintiff repeats and realleges all of the preceding allegations of this Complaint as though set forth fully herein.

88.     This count is asserted against Defendants under Section 20(a) of the Exchange Act.

89.     As alleged above, SFX violated Section 10(b) and Rule 10b-5, promulgated thereunder, by making false and misleading statements in connection with the purchase or sale of SFX's securities. This fraudulent conduct was undertaken with scienter, as SFX is charged with the knowledge and scienter of Defendants and others who knew of or recklessly disregarded the inaccuracy of SFX's statements and of the fraudulent nature of the scheme described herein.

90.     Defendants were controlling persons of SFX, within the meaning of Section 20(a) of the Exchange Act, by reason of their positions as senior executive officers and/or directors of

SFX, their ability to approve the content and issuance of SFX's public statements, and their control over SFX's day-to-day operations. The individual Defendants had the power and authority to direct and control, and did direct and control, directly or indirectly, the decision-making of SFX as set forth herein. Each Defendant had direct and supervisory involvement in the day-to-day operations of SFX and, therefore, is presumed to have had the power to control or influence the conduct giving rise to the violations of the federal securities laws alleged herein. In fact, Defendants exercised the same.

91.     Defendants prepared, signed, and/or approved SFX's press releases and SEC filings that contained material false and misleading statements or omitted material facts. Defendants were provided with or had unrestricted access to copies of those statements prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be made.

92.     Defendants did not act in good faith in connection with the conduct at issue in this claim.

93.     Defendants are culpable for participation in the matters alleged herein, because they acted with knowledge that SFX's public statements were materially false or misleading, or omitted material information, or they acted with reckless disregard for the truth.

94.     By virtue of their positions as controlling persons of SFX, Defendants are jointly and severally liable to Plaintiff pursuant to Section 20(a) of the Exchange Act for SFX's violations of Section 10(b).

COUNT III
For Common Law Fraud
(Against All Defendants)

95.     Plaintiff repeats and realleges all of the preceding allegations of this Complaint as though set forth fully herein.

96.     This Count is asserted against all Defendants based on common law principles of fraud and conspiracy.

97.     As alleged herein, each Defendant made material misrepresentations and omitted to disclose material facts about SFX, SFX's financial condition, the Transaction, and Sillerman's and SFX's intent in connection with the Transaction.

98.     In addition, Defendants conspired with each other for the purpose of misleading Plaintiff and the investing public regarding SFX, SFX's financial condition, the Transaction, and Sillerman's and SFX's intent in connection with the Transaction, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

99.     The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiff and the investing public when making investment decisions.

100.    The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under common law.

101.    Plaintiff reasonably relied upon Defendants' misrepresentations when deciding to purchase shares of Common Stock, and did not know of any of the misrepresentations and omissions, as alleged with further detail herein.

102.    As a direct and proximate result of Defendants' fraud and deceit, Plaintiff suffered damages in connection with its purchase of shares of Common Stock.

103.    Defendants' fraud and deceit was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including not only Plaintiff, but the investing public. As a result, Defendants should be required to pay punitive damages to Plaintiff.

COUNT IV
For Negligent Misrepresentation under New York Common Law
(Against All Defendants)

104.    Plaintiff incorporates by reference each of the substantive paragraphs of this Complaint except allegations that Defendants made the untrue statements of material facts and omissions intentionally or recklessly. For the purposes of this claim, pleading the alternative, Plaintiff asserts negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

105.    SFX had a legal duty to provide shareholders, including Plaintiff, with correct information concerning SFX's business operations.

106.    The individual Defendants, as officers and directors of SFX, had a legal duty to report accurate information concerning SFX's business operations and events relating to SFX so that information could be reported to shareholders and/or had a personal duty to provide shareholders, including Plaintiff, with correct information concerning SFX's business operations and events relating to SFX.

107.    Plaintiff was wholly without knowledge of Defendants' fraudulent scheme, and could not reasonably have been expected to know of such practices. Defendants had knowledge of the facts concerning SFX, SFX's business, the Transaction, and Sillerman's and SFX's intent in connection with the Transaction. Defendants repeatedly reassured the investing public, including Plaintiff, that Defendants intended to consummate the Transaction, when Defendants knew or should have known that the Transaction had no reasonable possibility of being

29

consummated and that the true intent of the Transaction was to induce a third-party to acquire SFX at an inflated price. Defendants made and/or caused to be made false and misleading statements to shareholders, including Plaintiff, concerning, among other things, SFX, SFX's business, the Transaction and Sillerman's and SFX's intent in connection with the Transaction.

108.    Defendants acted negligently in making their statements to shareholders, including Plaintiff, which were false and misleading.

109.    Defendants' false and misleading statements to shareholders, including Plaintiff, were made for a serious purpose, and Defendants knew that shareholders, including Plaintiff, desired this information for a serious purpose (*i.e.*, to make significant investment decisions).

110.    Plaintiff intended to rely and act upon Defendants' false and misleading statements, and did in fact reasonably rely upon Defendants' false and misleading statements to Plaintiff's detriment.

111.    The market price for shares of Common Stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

112.    The market price for shares of Common Stock declined materially when the foreseeable risks concealed by Defendants' misleading statements materialized.

113.    As a direct and proximate result of the alleged wrongful conduct, Plaintiff suffered damages in connection with its purchase of shares of Common Stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment against Defendants, as follows:

A.  Determining that this action is a proper class action and certifying Plaintiff as the class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Rule 901 of the CPLR.

B.  Awarding compensatory damages in favor of Plaintiff and the other members of the Class against Defendants for all losses and damages suffered as a result of Defendants' wrongdoing;

C.  Requiring Defendants to provide rescission or to pay rescissionary damages or actual damages sustained by Plaintiff and the other members of the Class by reason of the acts and transactions alleged herein;

D.  Requiring Defendants to pay punitive damages for their violations of common law fraud and by reason of the acts and transactions alleged herein;

E.  Awarding Plaintiff and the Class their fees and expenses incurred in this action, including attorneys' fees and expert fees;

F.  Awarding Plaintiff prejudgment interest and/or opportunity cost damages; and

G.  Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 20, 2015
New York, New York

ANDREWS KURTH LLP

By: *Lynne M. F. Uniman*

Paul N. Silverstein (PS 5098)
Lynne Fischman Uniman (LU 6750)
Jeremy B. Reckmeyer (JR 7536)
450 Lexington Avenue, 15th Floor
New York, New York 10017
Telephone: (212) 850-2800
Facsimile: (212) 850-2929
Email: psilverstein@akllp.com
        luniman@akllp.com
        jreckmeyer@akllp.com

ABBEY SPANIER, LLP

Arthur N. Abbey
aabbey@abbeyspanier.com
Nancy Kaboolian
nkaboolian@abbeyspanier.com
Stephen T. Rodd
srodd@abbeyspanier.com
212 East 39th Street
New York, NY  10016
Tel.:  (212) 889-3700
Fax:  (212) 684-5191

*Attorneys for Plaintiff*

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Matthew Yukelson, declare as follows:

1.   I am a vice president of Wilfrid Aubrey LLC (the "Advisor"), which is investment manager for Wilfrid Global Opportunity Fund LP. (the "Fund").

2.   The Advisor has full discretion and controls all the investments of the Fund.  I am authorized to act on behalf of the Fund.

3.   I have reviewed a copy of the Complaint filed in this action.

4.   The Fund did not purchase the security that is the subject of this action, SFX Entertainment, Inc. (NASDAQ:SFXE), at the direction of counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

5.   The Fund is willing to serve as a representative party on behalf of a class and I am willing to testify at deposition and trial, if necessary.

6.   The Fund's transactions in SFX Entertainment, Inc. securities during the class period identified in the Complaint (and thereafter) are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase, Sale) | Quantity | Trade Date | Price Paid/Received |
|---|---|---|---|---|
| Common Stock | Purchase | 26,814 | 03/10/2015 | 4.5906 |
| Common Stock | Purchase | 100,000 | 03/11/2015 | 4.5686 |
| Common Stock | Purchase | 64,397 | 03/13/2015 | 4.3202 |
| Common Stock | Purchase | 31,434 | 03/17/2015 | 4.0086 |
| Common Stock | Purchase | 50,000 | 03/18/2015 | 3.9203 |
| Common Stock | Purchase | 50,000 | 03/27/2015 | 4.2600 |
| Common Stock | Purchase | 5,800 | 04/10/2015 | 4.0426 |
| Common Stock | Purchase | 60,000 | 05/06/2015 | 4.2195 |
| Common Stock | Purchase | 2,517 | 05/20/2015 | 4.1860 |
| Common Stock | Purchase | 50,000 | 05/21/2015 | 4.1503 |
|  |  |  |  |  |
| Common Stock | Sale | 6,396 | 08/13/2015 | 2.0700 |
| Common Stock | Sale | 100,000 | 08/14/2015 | 1.6164 |
| Common Stock | Sale | 3,791 | 09/04/2015 | 0.4700 |
| Common Stock | Sale | 28,844 | 09/29/2015 | 0.4403 |
| Common Stock | Sale | 100,000 | 09/30/2015 | 0.4500 |
| Common Stock | Sale | 70,197 | 10/09/2015 | 0.9300 |
| Common Stock | Sale | 33,600 | 10/22/2015 | 1.0401 |
| Common Stock | Sale | 23,768 | 10/28/2015 | 0.9100 |
| Common Stock | Sale | 74,366 | 10/29/2015 | 0.9100 |

5.   The Fund has not served as or sought to serve as a representative party on behalf of a class during the last three years.

6.   The Fund will not accept any payment for serving as a representative party, except to receive the Fund's pro rata share of any recovery or as ordered or approved by the court or any award to the Fund or me by the Court of reasonable costs and expenses (including lost wages) directly relating to the Fund's representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

WILFRID GLOBAL OPPORTUNITY FUND LP
By: WILFRID AUBREY LLC, its investment manager

Dated:   November 20, 2015

Signed: _Matt Yukelson_____
Name: Matthew Yukelson
Title: Vice President