UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

EDWARD S. GUTMAN, on behalf of himself
And all others similarly situated,

        Plaintiff,

-against-                                          15 Civ. 7192 (CM)

ROBERT F.X. SILLERMAN, et al.,

        Defendants.

------------------------------------------------------------x

WILFRID GLOBAL OPPORTUNITY
FUND LP,

        Plaintiff

-against-                                          15 cv 8774 (CM)

ROBERT F.X. SILLERMAN, et al.

        Defendants.

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRO...
12/8/15

ORDER APPOINTING LEAD PLAINTIFF AND LEAD
COUNSEL, AMENDING CAPTION, AND CONSOLIDATING CASES

McMahon, J.:

      This is a securities fraud class action brought pursuant to the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §78(u)-4. This order disposes of multiple pending motions for appointment as lead plaintiff/lead counsel, and the motion by Wilfrid Global Opportunity Fund for consolidation of its action with the first-filed action relating to Defendant SFX Entertainment, Inc., the above-captioned Gutman matter.

## The Untimely Lead Plaintiff Motion Filed by the
## Wilfred Global Opportunity Fund LP Is Denied

The PSLRA — which was passed to prevent "lawyer-driven litigation," *Elstein v. Net 1 UEPS Techs., Inc.*, No. 13 Civ. 9100 (ER), 2014 WL 3687277, at *2 (S.D.N.Y. July 23, 2014) — sets out a detailed schedule of events for ascertaining lead plaintiff status. There is no longer a "race to the courthouse," with lawyers jockeying to be the first to file a class action complaint. Instead, once someone – anyone – files "the complaint," a more seemly contest for lead plaintiff status begins.

Within twenty days after the date on which "the complaint" is filed, the plaintiff or plaintiffs who filed "the complaint" (or, if more than one is filed, the first-filed complaint) must publish a notice advising the plaintiff class (and, more importantly, the members of the class action Bar) of the pendency of the action, the claims asserted in the complaint and the purported class period (15 U.S.C. §78u-4(3)(A)(i)(I)). The notice must also advise that any member of the putative class may move for lead plaintiff status within 60 days – whether that individual files a complaint or not.

"The PSLRA is unequivocal and allows for no exceptions. All motions for lead plaintiff must be filed within sixty (60) days of the published notice for the first-filed action." *In re Telxon*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999); *Topping v Deloitte Touche Tohmatsu CPA, Ltd.*, 95 F. Supp., 3d 607, 618-20 (S.D.N.Y. 2015). The court is charged with considering all such motions within 90 days after the notice is published. Certain rebuttable presumptions guide the court's choice of lead plaintiff, the principal one being that the most adequate plaintiff in any private action is the person or group of persons that has either (1) filed "the complaint" *or* made a motion in response to the above-described notice; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

With these facts in mind, I address the strange case of the Wilfrid Global Opportunity Fund.

The first complaint filed against SFX Entertainment – "the complaint" – was filed on behalf of one Edward S. Gutman; Mr. Gutman was represented by the well-known firm of Abbey Spanier LLP. He calculated his loss at $116,650. In addition to filing his pleading, Mr. Gutman filed a timely motion for lead plaintiff status, although technically that was not necessary, since under terms of the PSLRA the person who files "the complaint" is automatically considered for lead plaintiff status.

The 60 day window for filing such motions closed on November 10, 2015. Several other potential lead plaintiffs surfaced during that period: Guevoura Fund Ltd., which calculated its loss at $73,492.75; Mr. Rong Liu, who calculated his loss at $187,183; and Phillip Alfeld Jr., who calculated his loss at $150,133.76. On November 12, the court commenced its consideration

of the motions that had been made during the statutory period. Shortly thereafter, Alfeld filed what I will call a "conditional" withdrawal; he withdrew his motion in favor of Guevoura, but announced that he stood ready and willing to be named lead plaintiff if Guevoura was not.

Then, on November 23, 2015, a new potential lead plaintiff reared its head – not by filing a notice of motion, but by filing an opposition to the motions made by Rong Liu and Guevoura. The new opponent was Wilfrid Global Opportunity Fund (WGOF), represented by co-counsel: Abbey Spanier (which apparently threw its previous client, Mr. Gutman, under the bus) and Andrews Kurth. WGOF calculates its loss at $1,457,929, which far exceeds the loss of any of the parties who filed motions within the 60 day window. Simultaneously, Mr. Gutman withdrew his motion in favor of WGOF.

WGOF admittedly did not file a motion for lead plaintiff status within the sixty day window – indeed, has not filed a notice of motion to this date. What WGOF did was two things, neither of which was contemplated by the PSLRA.

First, it filed a separate complaint against SFX relating to the same matters as in the Gutman suit. It filed that pleading ten days after the expiration of the 60 day period. WGOF's counsel contends that this complaint "relates back" to an individual complaint (not a class action complaint) that was filed on November 6, 2015, by Wilfrid Aubrey LLC, which is the investment manager for WGOF. However, the Second Circuit held some years ago that an investment manager lacks Article III standing to assert claims under the federal securities laws on behalf of its client. *W.R. Huff Asset Mgmt. Co., LLC, v. Deloitte & Touche LLP*, 549 F. 3d 100, 109-10 (2d Cir. 2008). Thus the action filed on November 6 was dismissible on its face; it was a constitutional nullity.

WGOF also filed an "opposition" to the lead plaintiff motions of Liu and Guevoura. The "opposition" does not read like an "opposition," but like a motion for lead plaintiff status – with headings like "Wilfrid Should Be Appointed Lead Plaintiff," and "Wilfrid Satisfies the Requirements of Rule 23." WGOF excused the absence of a motion by pointing to the language in the PSLRA, which announces that the most adequate lead plaintiff is presumptively the person or group of persons that has *either* "filed the complaint" or "made a motion in response to notice." It cited cases from the District of Massachusetts and the Eastern District of Virginia for the proposition that the sixty day PSLRA window does not apply to putative class members who file "a complaint" – even if they file no timely motion for lead plaintiff status. *In re Microstrategy Inc., Sec. Litig.*, 100 F. Supp. 2d 427, 433. n. 12 (E.D.Va. 2000); *Coopersmith v. Lehman Bhd., Inc.*, 344 F. Supp. 2d 783, 790-91 (D. Mass 2004).

With all respect to these esteemed courts, they misread the statute. The PSLRA does not say that lead plaintiff status can be obtained by filing either a timely motion or "*a* complaint;" it says that lead plaintiff status can be obtained either by filing a timely motion or "*the* complaint." The choice of article makes a huge difference. As a simple matter of English syntax, only one complaint can qualify as "the complaint" – the article "the" specifies one particular thing when

followed by a singular noun. *The Chicago Manual of Style* § 5.68 (16th ed. 2010) ("An article is a limiting adjective that precedes a noun or noun phrase and determines the noun or phrase's use to indicate something definite (*the*) or indefinite (*a* or *an*)."). As used in the PSLRA, "the complaint" is the first complaint filed in a federal court – the one that starts the clock running on the 20 day period for filing notice to the putative class members.

Any doubt that this court's reading of the phrase "*the* complaint" is correct is erased by reading Sections 78u-4(a)(3)(A)(i) and (ii) together. The former says, "Not later than 20 days after the date on which *the complaint* is filed, the plaintiff or plaintiffs shall cause to be published....a notice....," and the latter says, "If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i)." In other words, where there are multiple complaints (as there often are in securities fraud cases), clause (ii) makes it clear that the first-filed complaint is "the complaint" – the one whose filing triggers the beginning of all PSLRA time periods. Any subsequently-filed complaints are irrelevant for lead plaintiff purposes.

It is perfectly obvious, therefore, that WGOF's complaint cannot be "the complaint" for lead plaintiff purposes; not only was it not the pleading that triggered the 20 day notice requirement, it was not filed until after the 60 day window for filing a lead plaintiff motion had passed!

A principal purpose of the PSLRA was to prevent just the kind of gamesmanship in which WGOF and its counsel have engaged here, by putting everyone who wanted lead plaintiff status on an equal footing, with a decision to be made on the merits and under a strict timetable. The presumptive lead plaintiff is the person with the largest financial interest who either (i) files "*the*" complaint [i.e., the one referred to in Section 78u-4(a)(3)(A)(i), the pleading that triggers the beginning of the running of the PSLRA clock], or (ii) makes a motion within the 60 day window following the publication of the notice. The party who files "the" complaint does not need to make a motion – he is automatically to be considered for lead plaintiff status – but everyone else who wants that honor must file a motion within 60 days. This reading and only this reading gives meaning to all the words in the statute – including the word "the" – and does not insert any words that are not in the statute – including but not limited to the word "a," an article that is not used to modify the noun "complaint" in Section 78u-4(a)(3)(A)(i)).

In short, I find WGOF's reading of the statute entirely unpersuasive and contradicted by the literal language of the relevant section, and I reject it.

Since WGOF neither filed "the" complaint as that term is used in 78u-4(as)(3)(A)(i) nor made a motion for lead plaintiff status by November 10, 2015, it is not only not presumptively the lead plaintiff, it is statutorily barred from being lead plaintiff. Even reading the "opposition" that it filed for what that pleading truly is – an untimely motion for lead plaintiff status – it must be and is denied simply because it is untimely.

I would not select WGOF as lead plaintiff, or its counsel as lead counsel, in any event. They engaged in chicanery in order to try to get WGOF into the game when time was expiring. They caused a party that lacked Article III standing – WGOF's investment manager – to file a complaint, not on behalf of a class, but purportedly on behalf of its client, WGOF. No reason has been given why WGOF did not simply file its own complaint within the sixty day window, and no circumstances can justify running afoul of settled Second Circuit precedent in order to concoct a bogus argument that WGOF had asserted claims prior to the expiration of the 60 day window on November 10, 2015. If WGOF's counsel were unaware of the *Huff* case, then they are not competent to represent a class before this court.

Furthermore, the obvious effort to shoehorn Abbey Spanier into lead counsel status – after the firm filed both "the complaint" and a motion on behalf of a client with a lesser holding than some of the other lead plaintiff movants – causes me to conclude that the WGOF action is "lawyer driven" rather than "shareholder driven." *Elstein, supra*, 2014 WL 3697277, at *2. Mr. Gutman acquiesced in Abbey Spanier's trickery; he, the party who filed "the complaint," withdrew his motion in favor of WGOF – whether for some consideration or not is unknown to the court. This suggests that the Gutman lawsuit, too, was "lawyer driven," and so renders him personally unfit to serve as lead plaintiff. I will, therefore, not resurrect his lead plaintiff motion, which he withdrew in favor of WGOF.

## Liu's Motion for Appointment as Lead Counsel is Denied; Guevoura's is Granted

This leaves Guevoura and Liu as the next candidates to be considered. As noted above, Philip Alfeld, Jr., represented by Levi & Korsinsky LLP, conditionally withdrew in favor of Guevoura, but indicated that he was ready and willing to serve if Guevoura were not appointed. I have taken Mr. Alfeld at his word and am first considering whether it would be appropriate to appoint Guevoura.

Liu and Guevoura disagree about which of them has the larger financial interest, as they use different methods to calculate their loss. Neither one of them calculates loss correctly, however, which has made it particularly difficult to evaluate their competing claims.

"The PSLRA does not specify a method for calculating which plaintiff has the 'largest financial interest' ...." *In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 436 (S.D.N.Y.2008). Many courts in this District, however, have determined a prospective lead plaintiff's financial interest by looking to "(1) the number of shares purchased; (2) the number of net shares purchased; (3) total net funds expended by the plaintiff[ ] during the class period; and (4) the approximate losses suffered by the plaintiff[ ]." *In re CMED Sec. Litig.*, No. 11 Civ. 9297(KBF), 2012 WL 1118302, at *3 (S.D.N.Y. Apr. 2, 2012) (citing *Lax v. First Merchants Acceptance Corp.*, Nos. 97 Civ. 2715, 1997 WL 461036, at *5 (N.D.Ill. Aug. 11, 1997)); *see also Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 475 (S.D.N.Y.2011) (citing same); *In re Fuwei Films*, 247 F.R.D. at

437 (same). "Most courts agree that the largest loss is the critical ingredient in determining the largest financial interest and outweighs net shares purchased and net expenditures." *Richman,* 274 F.R.D. at 479; *see also Bo Young Cha v. Kinross Gold Corp.,* No. 12 Civ. 1203(PAE), 2012 WL 2025850, at *2 (S.D.N.Y. May 31, 2012) (collecting cases). In calculating loss, "[c]ourts in this district have a 'very strong preference' for the 'last-in, first-out' method of calculating losses." *Rosian v. Magnum Hunter Res. Corp.,* No. 13 Civ. 2668(KBF), 2013 WL 5526323, at *1 (S.D.N.Y. Oct. 7, 2013) (quoting *Richman,* 274 F.R.D. at 476)."

Liu claims to have a total loss of $187,183. He calculated his loss using the LIFO method approved in this Circuit. However, Guevoura argues that Liu actually suffered no loss, because he sold all his shares prior to 1:15 PM on August 14, 2015 – the date and time when Guevoura says the first allegedly curative disclosure was made.

If Guevoura is correct about the time of the first curative disclosure, then it is also correct that Liu's losses from sales prior to that curative disclosure are not recoverable in this action. That is clear from the Supreme Court's decision in *Dura Pharmaceuticals v. Broudo,* 544 U.S. 336 (2005).

When evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit consider that plaintiff's recoverable loss, and do not take into account losses from shares sold prior to corrective disclosures. *Sallustro v. CannaVest Corp.,* 93 F. Supp. 3d 265, 272-275 (S.D.N.Y. 2015). "While the *Dura* court addressed a motion to dismiss, the Court's reasoning applies with equal force to a motion to appoint [lead plaintiff and] lead counsel." *In re LightInTheBox,* 2013 WL 6145114, at *3. Therefore, when evaluating a plaintiff's financial interest for purposes of selecting a lead plaintiff, courts in this Circuit consider that plaintiff's recoverable loss, and do not take into account losses from shares sold prior to corrective disclosures. *See, e.g., Porzio v. Overseas Shipholding Group,* Nos. 12 Civ. 7948, et al., 2013 WL 407678, at *3 (S.D.N.Y. Feb. 1, 2013) (denying lead plaintiff status to investor group where most of the stock purchased was sold before corrective disclosure); *Bensley v. FalconStor Software, Inc.,* 277 F.R.D. 231, 235–42 (E.D.N.Y. 2011) (denying lead plaintiff status to a so-called "in-and-out" trader, where stock was arguably sold before the company's disclosure of fraud); *In re Veeco Instruments, Inc. Sec. Litig.,* 233 F.R.D. 330, 333 (S.D.N.Y. 2005) (rejecting applicant for lead plaintiff status where applicant had sold all of its stock prior to curative disclosure); *see also Kops v. NVE Corp.,* Nos. 06 Civ. 574(MJD)(JJG), et al., 2006 WL 2035508, at *5 (D.Minn. July 19, 2006) (rejecting lead plaintiff applicant who sold all his shares prior to corrective disclosure); *Ruland v. InfoSonics Corp.,* Nos. 06 Civ. 1231(BTM)(WMC), et al., 2006 WL 3746716, at *5–6 (S.D.Cal. Oct. 23, 2006) (holding that *Dura* loss is the proper calculation method for measuring parties' financial stake in litigation).

"[T]he court would be abdicating its responsibility under the PSLRA if it were to ignore [the issue of loss causation at the lead plaintiff appointment] stage." *In re Comverse,* 2007 WL 680779, at *5. "Although a precise determination of damages is not possible at this stage of the litigation, courts typically equate 'largest financial interest' with amount of *potential recovery.*" *Ruland,* 2006 WL 3746716 at *5 (emphasis in original). Relying on losses that, under *Dura,* are clearly not recoverable is irreconcilable with this Court's duty to ascertain which plaintiff has the

greatest financial interest in this litigation. *See, e.g., In re McKesson HBOC, Inc. Sec. Litig.,* 97 F.Supp.2d 993, 997 (N.D.Cal.1999) (discussing the court's preference for methods that calculate financial interest in terms of recoverable damages, because "[o]ne's 'interest' in a litigation is rather directly tied to what one might recover") (internal quotation marks omitted).

In this Circuit, courts consider *Dura* loss even where, a lead plaintiff applicant has sufficiently pled loss causation as to *some* of her losses. *See In re LightInTheBox,* 2013 WL 6145114, at *3; *In re Comverse,* 2007 WL 680779, at *5. In *In re Comverse,* Judge Garaufis stated, "At bottom, either it is appropriate to consider loss causation, and the principles articulated by *Dura,* in the context of a PSLRA motion, or it is not...."*Dura* [and its progeny] ... require a court to make pre-discovery loss causation determinations regarding asserted claims (or parts of asserted claims) that are based on the facts alleged in the complaint." *In re Comverse,* 2007 WL 680779, at *5; *see also, Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 274-75 (S.D.N.Y. 2015)

Accordingly, "'losses result[ing] from "in-and-out" transactions, which took place during the class period, but before the misconduct identified was ever revealed to the public' are not to be included in loss calculations" for purposes of selecting the lead plaintiff. *Bensley,* 277 F.R.D. at 238 (quoting *In re Comverse,* 2007 WL 680779, at *3)."

Liu insists that he could nonetheless serve as lead plaintiff because some "partial corrective disclosure" occurred on August 13, 2015, which resulted in a substantial decline in the price of SFX common stock before the 1:15 PM release on August 14. (Docket #56 at 1; Docket #31, at 3). But while his moving brief mentions that something negative happened on August 13 (Sillerman missed a deadline to come up with financing), Liu does not identify for the court any public statement that was made about this incident until 1:15 PM on August 14. The issue is when the corrective disclosure was made; I have searched Liu's moving papers repeatedly and I can find no reference to any public statement about Sillerman's default, or any other negative event that took place on or about August 13, until August 14.

There is no need for the court to resolve definitively the issue of whether there was any disclosure on August 13, because Guevoura both sold shares on August 13 and held shares thereafter. It sold 44,700 shares prior to any curative disclosure on August 13 – just as Liu did – but it held 100,675 shares through the end of the class period (August 17) and beyond. Therefore, Guevoura alleges a *Dura* loss.

But Guevora did not calculate its loss using the LIFO method that has been approved in this Circuit in numerous cases — including many cases decided after *Dura* (see above). Instead, it calculated its loss on the 100, 675 shares that it held through the second curative disclosure and beyond by subtracting the share price following the curative disclosure from the share price immediately prior to disclosure. The purchase price of the shares did not factor into the loss calculation. This calculation yielded an ostensible financial interest of $73,492.75. I assume that Guevoura did this because it did not sell any securities in response to the two disclosures that it identifies as curative.

Guevoura's method of calculating its loss was rejected as inconsistent with both the case law in this Circuit, but with *Dura* itself. As my colleague Judge Gardephe recently held in *Sallustro v. CannaVest Corp.*, 93 F.3d 265, 276 (S.D.N.Y. 2015):

> [Proposed Lead Plaintiff's] new loss model—which renders purchase price irrelevant—is inconsistent with the statutory scheme and with *Dura* itself. As noted above, the PSLRA provides for a statutory cap on damages that is calculated based on the "difference between the purchase or sale price paid ... by the plaintiff for the subject security and the mean trading price of that security during the 90–day period beginning on the date on which [disclosure is made]." 15 U.S.C. § 78u–4(e)(1). Given the statutory scheme, it would be odd to apply a loss model that precludes any reference to purchase price.
>
> Moreover, *Dura* mandates no such approach. *Dura* merely holds that, in fraud-on-the-market cases, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Dura*, 544 U.S. at 342, 125 S.Ct. 1627. But in holding that a plaintiff must plead loss causation—*i.e.*, a sale or retention of stock after a corrective disclosure—the Supreme Court did not rule that purchase price is irrelevant. To the contrary, the Supreme Court repeatedly states that purchase price might prove relevant to loss analysis. For example, the *Dura* court states that "[i]f the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss." *Id.* (emphasis in original). Similarly, the Court states that, "[g]iven the tangle of factors affecting price, ... the higher purchase price will *sometimes* play a role in bringing about a future loss." *Id.* at 343, 125 S.Ct. 1627 (emphasis in original)."
>
> Finally, countless decisions in this District have—in the context of selecting lead plaintiff—premised discussions of loss in part on purchase price. *(citations omitted)*... The adoption of a standard in which purchase price never plays a part in determining loss would work a radical change in the law. *Dura* requires no such result

When, at the request of the court, Guevora re-calculated is damages on the 100,675 shares using the LIFO method, its financial interest jumped to $419,589.34. Furthermore, if there was an August 13 "disclosure" that could have prompted stock sales, as Liu has argued, Guevoura's LIFO loss jumps to $482,829.40, because it sold 44,700 SFX shares on August 13, 2015, suffering a LIFO loss of $61,247.53 on the shares sold on that date. (Docket #55, filed in response to the court's question on December 6, 2015). That number far exceeds Liu's losses.

Furthermore, if, as Liu argues, sales on August 13 fall within the ambit of *Dura* losses, Guevoura – which sold shares on August 13, just as Liu did – is qualified to represent a class consisting of persons who sold in response to whatever happened on August 13, as well as a class of persons who suffered further losses as a result of the subsequent curative disclosures. Liu, who sold his entire holding before the August 14 or 17 disclosures, does not have claims typical of the entire group, as Guevora does.

The PSLRA presumption thus goes to Guevoura and its counsel, Brower Piven.

No one has suggested a reason why Guevoura's counsel, Brower Piven, is inadequate to the task of assuming lead counsel status. However, Liu asserts that Guevoura is not an adequate lead plaintiff because it has been subjected to orders of two regulatory agencies in Europe. Finanstilsynet (the Financial Supervisory Authority of Norway) recently fined Guevoura in connection with an alleged violation of the Norwegian Securities Trading Act, and the Netherlands Authority for the Financial Markets (AFM) fined BRSG Advisor SA (the predecessor to Swiss Arb, an investment advisor to Guevoura) for allegedly violating the Dutch Financial Supervision Act.

Guevoura admits that both events occurred, but says that it makes no difference to the outcome of this motion, because no one has offered "proof" that it would not fairly and adequately protect the interests of the class or that it is subject to unique defenses, and argues that the presumption in its favor holds.

First, Guevoura points out that it was not the alleged offender in the Netherlands. In that instance, the predecessor to its current investment advisor was accused of engaging in auction manipulation not related to Guevoura. SwissArb denied the claim, although after three years of proceedings it paid an administrative fine to end the matter.

Just as this court refuses to accept WGOF's "relation back" argument because a (not the) timely complaint was filed by its investment advisor, which lacked standing to bring an action on its client's behalf (see *supra*, at 3), so too I will not impute the conduct of Guevoura's investment advisor to its client. There is no evidence that Guevoura had anything to do with the matter being investigated by the AFM, which was eventually settled. The AFM matter is irrelevant to the motion before the court.

The Norwegian fine was imposed on Guevoura, however, so that matter is relevant. The court must decide whether the fact that this fine was imposed by Finanstilsynet rebuts the presumption that Guevoura should be the lead plaintiff. I conclude that it does not.

The facts of the matter are these: in early April 2014, SwissArb, on behalf of Guevoura, sold shares of DiaGeneic ASA that could not be delivered as required by the NSTA. The delay in delivery was the result of confusion about when the shares would be listed and tradable on the Norwegian exchange. Because of the error, Finanstilsynet compelled Guevoura to disgorge the profit made on those sales, in the amount of approximately $11,500. No fine was ever imposed and no criminal charges were brought against either Guevoura or Swiss Arb in connection with this matter.

Guevoura has never been sanctioned by any government or United States self-regulatory organization. It is not the subject of any known pending investigation in any country, including the United States, Norway or the Netherlands. It has never been accused of misconduct in the United States, where 50-60% of its funds are invested. It is permitted to trade freely on exchanges throughout the world on exactly the same basis as any other investor.

Given the facts of the Norwegian case, the relatively minor and technical nature of the infraction (late delivery of shares to settle a trade), and Guevoura's unblemished record in the United States and elsewhere, I conclude that the PSLRA presumption has not been rebutted.

Guevoura's motion for lead plaintiff status is granted; its chosen counsel, Brower Piven, is hereby appointed lead counsel.

Because Guevoura has been appointed lead plaintiff, the caption of the case at docket number 15 Civ. 7192 shall be amended to read, "Guevoura Fund Ltd., on behalf of himself and all others similarly situated" against the Defendants.

WGOF has made a motion to consolidate its case with the Gutman (now Guevoura Fund) case. The court grants the motion and directs the Clerk to consolidate the WGOF case, 15 Civ. 8774, into the lead case for all purposes.

The Clerk should remove the motions at Docket Nos. 22, 25, 27, 30, 33 and 40 from the court's list of open motions.

Dated: December 8, 2015

U.S.D.J.

BY ECF TO ALL COUNSEL